**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RKF RETAIL HOLDINGS, LLC, | |
| Plaintiff, | Case No. 2:14-cv-01232-APG-GWF |
| vs. | Case No. 2:15-cv-01446-APG-GWF |
| TROPICANA LAS VEGAS, INC., | |
| Defendant. | **ORDER** |
| RKF RETAIL HOLDINGS, LLC, | **Re: Motion to Compel (ECF No. 101)** |
| Plaintiff, | |
| vs. | |
| EASTERN REAL ESTATE LLC, | |
| Defendant. | |

This matter is before the Court on Plaintiff's Motion to Compel (ECF No. 101) filed on May 1, 2017. Defendant Eastern filed its Opposition (ECF No. 106) on May 4, 2017. Plaintiff filed its Reply (ECF No. 120) to Eastern's Opposition on May 22, 2017. Defendant Tropicana filed its Opposition (ECF No. 113) and Countermotion for Protective Order (ECF No. 114) on May 15, 2017. Plaintiff filed its Reply (ECF No. 122) and Opposition (ECF No. 123) to Tropicana's opposition/countermotion on May 26, 2017. Defendant Tropicana filed its Reply (ECF No. 129) on June 2, 2017. The Court conducted a hearing in this matter on June 8, 2017.

**BACKGROUND**

Plaintiff RKF Retail Holdings, LLC ("RKF") and Defendant Tropicana Las Vegas, Inc. ("Tropicana") entered into an Exclusive Agency Agreement ("Agreement") on August 29, 2012 relating

to a planned retail shopping center to be constructed on the grounds of Tropicana's hotel/casino property in Las Vegas, Nevada. *Motion to Compel* (ECF No. 101), *Exhibit 1, Agreement.* Pursuant to the Agreement, Tropicana granted RKF the exclusive right as broker to lease space to prospective tenants in the shopping center "Premises" which was in the design development stage. *Id.* at ¶ 1. RKF was to use its best efforts to market the shopping center to prospective tenants consistent with a first class retail shopping mall. *Id.* at ¶ 2. The initial term of the agreement was one year, commencing on September 15, 2012. *Id.* at ¶ 1. The Agreement provided that RKF would be paid commissions on tenant leases as follows: 50% upon execution of a lease or the first construction draw whichever occurred later, and 50% upon the tenant opening for business at the shopping center premises. *Id.* at ¶ 6. If no lease was executed, then no commission would be deemed earned by RKF, and it would not be entitled to any payment from the Owner other than for preparing marketing materials. *Id.* at ¶ 7.

The Agreement provided four methods by which it could be terminated. First, the Agreement could be terminated after one year by either party on thirty days written notice. *Id.* at ¶ 1. Second, it could be immediately terminated if the Owner decided to cease its efforts in designing and developing the shopping center project. The Agreement would be automatically re-instated for a six (6) month period, however, if the Owner elected to start the project again within six (6) months after ceasing its efforts. *Id.* Third, the Owner could terminate the agreement if it entered into any sale, merger, acquisition, assignment or other disposition involving the Owner or the Premises. Upon termination for this reason, neither the Owner or its successor would have any further liability to RKF except to the extent that (i) commissions had been earned but not yet paid and (ii) the prospective tenant list pursuant to Section 18 was assumed by the successor in writing. If the prospective tenant list was not assumed by the successor, then the Owner would remain responsible for payment of commissions to RKF in accordance with Section 18. *Id.* at ¶ 8. Fourth, the Agreement could be terminated upon a default by RKF that was not cured within thirty 30 days following notice by the Owner. In the event of termination for default, RKF would not be entitled to any commissions, except to the extent that any commissions had been earned prior to termination in connection with any lease that has been fully executed and delivered by the parties. *Id.* at ¶ 11.

. . .

Paragraph 18 of the Agreement stated as follows:

> <u>Prospective Tenant List</u>.  Within fifteen (15) days after the expiration or effective date of termination of this Agreement, RKF shall submit to Owner a Prospective Tenant List (hereinafter the "List"), which shall be limited to prospective tenants that have either (i) visited the property where the Premises will be located with intent to lease space therein and expressed interest in writing (email included) in leasing space therein, or (ii) submitted or received a bona fide offer, bona fide letter of intent or bona fide written lease proposal during the term hereof.  If, within six (6) months after the expiration or effective date of termination of this Agreement, Owner enters into a transaction with any Tenant included on the List, Owner agrees to pay RKF the Commission as outlined herein (plus any Option Commissions or Expansion Commissions if applicable), in accordance with the terms hereof.
>
> Notwithstanding the foregoing, if at the end of such six (6) month period, Owner and a Tenant on the List are negotiating in good faith, then such six (6) month period shall be extended to the earlier of (a) the date on which the transaction is executed and (b) the date on which such good faith negotiations end without the transaction having been executed.  This paragraph shall survive the expiration or termination of this Agreement, including as it may relate to any Transfer.  In the event the Owner enters into a Transfer Agreement, Owner shall use commercially reasonable efforts to enter into an Assumption Agreement, a copy of which shall be sent to RKF within five (5) days of the effective date of the Transfer.  Any Transfer shall not release Owner of the obligation under this paragraph unless the Transferee enters into an Assumption Agreement.

*Agreement*, (ECF No. 101), *Exhibit 1*, ¶ 18.

On March 26, 2014, Tropicana sent a letter to RKF terminating the Agreement, effective immediately.  *Tropicana's Opposition* (ECF No. 113), *Exhibit A*.  Tropicana stated that it was terminating the Agreement, under Section 1.  It also stated that it was terminating the Agreement under Section 11 due to the numerous defaults by RKF, some of which it identified in the letter.  Tropicana stated that it was making the termination effective immediately to avoid exposing it to further harm and additional damages resulting from RKF's numerous defaults.  *Id.*  On April 8, 2014, RKF sent a letter to Tropicana reiterating its position that Tropicana had improperly and unlawfully terminated the Agreement.  With its letter, RKF provided "a list of prospective tenants for the Premises that are the subject of the agency agreement."  *Motion to Compel* (ECF No. 101)*, Exhibit 2.*

RKF filed its complaint against Tropicana on July 28, 2014.  RKF alleged that it performed substantial work to market the project and obtain letters of intent from prospective tenants, and performed other services outside the scope of the Agreement to assist Tropicana in developing the

3

project. It alleged that Tropicana "had no intention of immediate development of the Premises, but rather procured RKF's services in marketing and cultivating interest in its potential development by means of fraudulent misrepresentations of fact." RKF alleges causes of action against Tropicana for fraudulent inducement,[1] fraudulent concealment, breach of contract, contractual and tortious breach of the covenant of good faith and fair dealing, and unjust enrichment/quasi-contract. Tropicana filed a counterclaim on September 4, 2014, alleging that RKF misrepresented its ability to secure tenants for the proposed shopping center, and that had it known the true extent of RKF's experience and contacts, it would not have hired it. Tropicana alleges claims against RKF for fraudulent inducement, breach of contract, breach of the implied covenant of good faith and fair dealing, intentional and negligent interference with prospective economic advantage, and negligence.

On July 29, 2015, RKF filed a separate lawsuit against Eastern Real Estate, LLC, ("Eastern") which alleged that Eastern induced and conspired with Tropicana to terminate RKF's exclusive agency contract so that Tropicana and Eastern could then proceed with the development. RKF alleges claims against Eastern for tortious interference with contractual relations and prospective business relations, and aiding and abetting breach of fiduciary duty.[2]

The Tropicana was acquired by Penn National Gaming, Inc. on August 25, 2015. On September 16, 2015, Tropicana sent a letter to RKF stating: "Based on our telephone discussions last month, I know you are aware that Penn National Gaming, Inc. ("Penn") agreed to buy the Tropicana. That transaction has now closed, and Penn is now the owner of the Tropicana." *Tropicana's Opposition* (ECF No. 113), *Exhibit D*. Tropicana quoted paragraph 8 of the Agreement regarding termination upon a transfer or sell of the Owner or the Premises and asserted that provision as an additional ground for terminating the Agreement. Tropicana, however, stood by its earlier termination of the Agreement on March 26, 2014.

RKF claims that but for Tropicana's and Eastern's wrongful conduct, it would have earned six million dollars ($6,000,000.00) in commissions once the shopping center was completed and tenants

---

[1] RKF states in its opposition to Defendants' motions for summary judgment that it is dropping the fraudulent inducement claim.

[2] These actions were consolidated on May 10, 2016.

began operating their businesses. Tropicana has asserted throughout this litigation that it ceased development of the shopping center, and RKF therefore cannot prove any alleged loss of commissions. The evidence shows that on July 7, 2014, Eastern notified Tropicana that it had decided to withdraw from the project. *Opposition to Motion for Summary Judgment* (ECF No. 137)*, Exhibit 84.* Brian Kelly of Eastern testified , however, that Onex (Tropicana's parent) "asked us to come back to the project and we came back to the project and started again, but we never completed any sort of venture." *Tropicana's Opposition to Motion to Compel* (ECF No. 113), *Exhibit E*, Kelly deposition, pg. 125. Mr. Kelly stated that Eastern finally withdrew from the project in June 2015. Raymond Murphy of Eastern testified that Eastern's involvement in the project ended when the Tropicana was sold to Penn Gaming which may have been in or about June 2015. *Opposition* (ECF No. 113), *Exhibit F.* He further testified that Eastern "[was] working under a predevelopment agreement to see if there was a way to make this project viable, financially/physically, and then we were notified that Penn Gaming was buying Tropicana, the project was no longer there for us to work on." *Id.* at Murphy deposition, pgs. 47-48.

      Jim Reuter, an employee of Atlantic Retail which worked as the leasing agent for Eastern on the project, testified that "the deal had been on and off a couple of times, so I think there was a feeling that there was a possibility that the deal may be resurrected." *Opposition* (ECF No. 113), *Exhibit G,* Reuter deposition, pg. 226. He could not recall the exact date that Atlantic completely stopped working on the project, but believed it was prior to November 1, 2015. *Id.* at pgs 226-27. He further stated "I don't know if it was June or July of 2015." *Id.* at pg. 227. Mr. Reuter was not aware at the time of his April 4, 2017 deposition of any ongoing plans to develop a shopping center on the property. *Id.* at pg. 208. Bryan Anderson of Atlantic testified that Atlantic's involvement ended "[w]henever Eastern's involvement ended." *Opposition* (ECF No. 113), *Exhibit H*, Anderson deposition, pg. 46. He stated that Atlantic stopped working on the project when it was announced that Penn Gaming had purchased the property. *Id.* at pg. 147. He testified that Eastern reached out to Penn National Gaming to see if it could continue as a joint venture partner with it on the project. *Id.* at pg.154. Mr. Anderson was also unaware, at the time of his April 5, 2017 deposition whether there are current plans to develop a shopping center on the property. *Id.* at pgs 77-78.

      Tropicana's general counsel Joanne Beckett testified that she did not know "if Penn Gaming in

connection with its acquisition of Tropicana ever contemplated pursuing the development." *Opposition* (ECF No. 113), *Exhibit I*, Beckett deposition, pg. 136. She was not privy to any conversations that Tropicana's former president, Alex Yemenidjian, may have had with Penn Gaming regarding the continued pursuit of the shopping center project after the acquisition. She did not hear of any such plans. *Id.* at pgs 306-07.

RKF states that on March 31, 2017, it learned of the existence of "Penn Gaming/Tropicana documents showing that they fully intended to develop the Premises and had simply hid the continuing development plans from discovery." *Motion to Compel* (ECF No. 101), at pg. 2. RKF states that it received an email from a Las Vegas broker inquiring about RKF's interest in providing prospective tenants for a shopping center development on the Tropicana property. The broker attached a "'Master Plan and renderings for the Tropicana retail expansion' reflecting ongoing efforts to develop the Premises as a retail shopping center." *Id.* at pg. 7. *See Declaration of RKF's Counsel, Ross Bagley* (ECF no. 103), *Exhibit D*. The drawings or renderings prepared by Marnell Architecture are dated November 2016. *Id.* In light of this information, RKF moves to compel Tropicana to supplement its previous responses to requests for production of documents. Specifically, RKF argues that Tropicana should be ordered to supplement its responses to the following requests for production in RKF's first set of requests:

> Request No. 2: All documents concerning the Premises, including but not limited to development of the Premises;[3]
>
> Request NO. 7: All documents concerning representations made by Tropicana concerning the development of the Premises, including but not limited to documents concerning the timeline for development, the intention to develop and efforts toward development;
>
> Request No. 9: All documents concerning Tropicana's conduct in connection with development of the Premises; and
>
> Request No. 16: All documents concerning prospective or potential tenants of the Premises.

---

[3]RKF's motion refers to this request as Request No. 1. However, the quoted request is Request No. 2. *see Declaration* (ECF no. 103), *Exhibit A*.

*Motion to Compel* (ECF No. 101), pg. 6; *Declaration of RKF's Counsel, Ross Bagley* (ECF No. 103), *Exhibit D*.

Discovery closed on April 10, 2017. Without first moving to extend discovery, RKF served the following additional requests for production on Tropicana on April 4, 2017:

> 1. All documents concerning the Premises, including but not limited to any architectural and/or written plans and renderings prepared by or with Marnell Architecture or any other architecture firm concerning the development of the Premises. . . .
>
> 2. All documents concerning the potential development of the Premises for use other than that of retail space, including but not limited to the use of the Premises as; (1) a single tenant restaurant space, (ii) exhibit space; (iii) convention space; and (iv) multi-tenant food and beverage space. . . .
>
> 3. All documents concerning teleconferences or meetings with Marnell Architecture, The McGarey Group, or any other architects and/or brokers concerning the Premises involving Tropicana and/or Penn Gaming. . . .
>
> 4. All documents concerning Tropicana's and/or Penn Gaming's conduct in connection with the development of the Premises, including but not limited to (i) efforts to obtain financing or (ii) contact with real estate brokers, developers, potential tenants, agents or other third parties. . . .
>
> 5. All documents concerning teleconferences, meetings, or communications between Tropicana, Penn Gaming or any other third party concerning any decision to develop – or not develop – the Premises in 2017 or thereafter.
>
> 6. All documents concerning the announcement of any initial or updated development plans for a retail development project involving the Premises. . . .

*Declaration of RKF's Counsel, Ross Bagley* (ECF no. 103), *Exhibit E*.

RKF states that documents responsive to Request Nos 1, 2, 3, 4, and 6 should have been produced in supplemental responses to it prior requests. *Id.*

On April 4, 2017, RKF's lawyer also sent a letter to Tropicana's lawyer advising that "RKF has just become aware . . . that continuing plans for the continued development o the Premises are ongoing and that Tropicana possesses responsive documents concerning the continued development of the Premises that have not yet been produced." RKF asserted that Tropicana had a duty to produce such documents as a supplement to its responses to prior requests. *Declaration of RKF's Counsel, Ross Bagley* (ECF no. 103), *Exhibit F*. On April 7 and 20, 2017, RKF also served a subpoena duces tecum

and an amended subpoena duces tecum on Penn National Gaming, Inc. seeking the same documents set forth in the requests for production to Tropicana. *Declaration of RKF's Counsel, Ross Bagley* (ECF no. 103), *Exhibit I*. The subpoena also seeks:

> 5. All documents concerning the activities of Penn Gaming's Board of Directors ("Board") in connection with the development of the Premises, including but not limited to communications between members of the Board; communications between any members of the Board and any other third party; plans, presentations, surveys, reports, financials or other material submitted to the Board; votes of the Board; minutes of meetings of the Board; or resolutions or actions taken by the Board.

*Id.*

RKF also moves to reopen discovery to obtain additional information about Penn Gaming's shopping center development plans.

Tropicana argues that Penn Gaming's current development plans for the property are new and independent of the shopping center project that was pursued by Tropicana prior to Penn Gaming's acquisition of the property. It argues that Penn Gaming's current plans provide for a significantly smaller retail shopping area as a component of an overall plan to remodel the main entrance and casino area. It argues that these plans are irrelevant to the claims and defenses in this action and need not be produced. Tropicana further argues that RKF's sixth set of request for production are improper and untimely because they were served less than one week before the discovery cut-off date. It also argues that the subpoena served on Penn Gaming is untimely because it was served after discovery closed. Tropicana also argues that RKF unreasonably waited until May 1, 2017 to file its motion to compel and to reopen discovery.

**DISCUSSION**

1. **Timeliness of Plaintiff's Motion to Compel and to Reopen Discovery.**

Defendants argue that RKF's motion to compel and to reopen discovery should be denied on grounds of untimeliness. In *Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620, 622 (D.Nev. 1999), the court noted that "the Federal Rules of Civil Procedure and the Local Rules of this district do not specify a time limit for filing a motion to compel." Eighteen years after *Gault*, that statement is still true. *Gault* stated that a motion to compel may be filed after the close of discovery, and that absent unusual circumstances, it should be filed before the scheduled date for dispositive motions. The statements in *Gault* are only

general guideposts, not bright-line rules. *Williams v. Las Vegas Metropolitan Police Dept.*, 2015 WL 3489553, at *1 (D. Nev. June 3, 2015). The timeliness of a motion to compel must be determined based on the circumstances specific to that case. *Id.* A motion to compel filed on the last day of discovery, for example, may be untimely if it could and should have been filed much earlier. *E.E.O.C. v. Pioneer Hotel, Inc.*, 2014 WL 5045109, at *1-2 (D.Nev. Oct. 9, 2014). This Court and others have looked to the non-exhaustive list of factors set forth in *Days Inn Worldwide, Inc. v. Sonia Investments*, 237 F.R.D. 395, 398 (S.D. Tex. 2006), in analyzing the timeliness of a motion to compel. The factors include: (1) the length of time since the expiration of the deadline; (2) the length of time the moving party has known about the discovery; (3) whether the discovery deadline has been previously extended; (4) the explanation for the tardiness or delay; (5) the age of the case; (6) prejudice to the party from whom discovery is sought; and (7) disruption of the court's schedule.

RKF states that it first learned of Penn Gaming's current development plans at the end of March 2017. Upon learning about Penn Gaming's development plans, RKF promptly notified Tropicana of its duty to supplement its prior discovery responses and also served its sixth set of request for production of documents. Although RKF arguably should have moved to extend the April 10th discovery deadline before it expired, and should have obtained such an extension before it served its sixth set of requests for production,[4] RKF did not engage in unnecessary delay under the circumstances. The fact that RKF's motion was filed 20 days after the discovery deadline expired was also not unreasonable given that RKF learned of Penn Gaming's development plans less than two weeks before the expiration of discovery.[5]

---

[4] Written discovery requests are untimely if they are not served at least 30 days before the discovery cut off date. *Collins v. Landry's Inc.*, 2015 WL 3505315, at *2 (D.Nev. June 3, 2015) (citing *Bishop v. Potter*, 2010 WL 2775332, at *1 (D.Nev. July 14, 2010)). Thus, absent an order extending the discovery period or shortening the time for response, Tropicana was not required to respond to RKF's sixth set of requests for production.

[5] Based on the present record, the Court rejects RKF's assertion that Tropicana and Penn Gaming intentionally concealed Penn Gaming's development plans in an attempt to prevent RKF from obtaining admissible evidence. First, as discussed hereafter, there is a reasonable argument that Penn Gaming's current development plans are substantially different from the prior shopping center project, and therefore irrelevant to the claims and defenses in this case. Second, neither RKF or the Court knows when Penn Gaming began its plans to further develop the Tropicana property. Third, Penn Gaming has made its development plans public to those who may be interested in leasing or providing prospective tenants for the development— which is how RKF learned of the plans.

Tardiness or delay, therefore, is not valid ground upon which to deny RKF's motion to compel or to reopen discovery.

### 2. **Relevance and Proportionality.**

Rule 26(b)(1) of the Federal Rules of Civil Procedure, as amended in 2015, provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and the importance of the discovery in resolving the issues, and whether the burden and expense of the proposed discovery outweighs its likely benefit. Information within the scope of discovery need not be admissible in evidence to be discoverable."

The intent of the 2015 amendments to Rule 26(b) was to encourage trial courts to exercise their broad discretion to limit and tailor discovery to avoid abuse and overuse, and to actively manage discovery to accomplish the goal of Rule 1 "'to secure the just, speedy, and inexpensive determination of every action and proceeding.'" *Roberts v. Clark County School District*, 312 F.R.D. 594, 601–04 (D. Nev. 2016). The court, quoting Chief Justice Roberts' 2015 Year-End Report, states:

> The 2015 amendments to Rule 26(b)(1) emphasize the need to impose "reasonable limits on discovery through increased reliance on the common-sense concept of proportionality." The fundamental principle of amended Rule 26(b)(1) is "that lawyers must size and shape their discovery requests to the requisites of a case." The pretrial process must provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary and wasteful discovery. This requires active involvement of federal judges to make decisions regarding the scope of discovery.

*Roberts*, 312 F.R.D. at 603. *See also Nationstar Mortgage v. Flamingo Trails No. 7*, 316 F.R.D. 327, 331 (D.Nev. 2016).

In *In re Bard IVC Filters Products*, 317 F.R.D. 562, 563 (D.Ariz. 2016), the court noted that prior to the 2015 amendments, Rule 26(b) provided that inadmissible evidence was discoverable if it "appears reasonably calculated to lead to the discovery of admissible evidence" and that some courts, and many lawyers, used this language to define the scope of discovery. The 2015 amendments eliminated the "reasonably calculated" language and replaced it with the more direct declaration that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."

*Id.* at 563 (quoting rule). *Bard* states:

> Relevancy alone is no longer sufficient—discovery must also be proportional to the needs of the case. The Advisory Committee Note makes clear, however, that the amendment does not place the burden of proving proportionality on the party seeking discovery. The amendment "does not change the existing responsibilities of the court and the parties to consider proportionality, and the change does not place on the party seeking discovery the burden of addressing all proportionality considerations." Rule 26, Advis. Comm. Notes for 2015 Amends. Rather, "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes."

*Bard*, 317 F.R.D. at 564.

Generally, the party opposing discovery has the burden of showing that it is irrelevant, overly broad, or unduly burdensome. *Graham v. Casey's General Stores*, 206 F.R.D. 251, 253-4 (S.D.Ind. 2000); *Fosbre v. Las Vegas Sands Corp.*, 2016 WL 54202, at *4 (D.Nev. Jan. 5, 2016); *Izzo v. Wal-Mart Stores, Inc.*, 2016 WL 593532, at *2 (D.Nev. Feb. 11, 2016). When a request is overly broad on its face or when relevancy is not readily apparent, however, the party seeking discovery has the burden to show the relevancy of the request. *Desert Valley Painting & Drywall, Inv. v. United States*, 2012 WL 4792913, at *2 (D.Nev. Oct. 9, 2012) (citing *Marook v. State Farm Mut. Auto. Ins. Co.* 259 F.R.D. 388, 394-95 (N.D. Iowa 2009)). The 2015 amendments to Rule 26(b) have not changed these basic rules, although they must now be applied with a greater degree of analysis and emphasis on proportionality.

RKF alleges that Tropicana and Eastern acted in a fraudulent and wrongful manner to remove RKF as the leasing agent and prevent it from receiving the commissions to which it would be entitled. Tropicana argues, however, that the shopping center was never constructed and, therefore, there are no leases upon which RKF could have earned commissions. Although RKF argues that it is entitled to recover the projected commissions even if the shopping center is not developed, its damages claim is certainly undermined if the shopping center project was not economically viable.

Based on the evidence so far submitted, Penn Gaming's current development plans appear to be substantially different from the shopping center project previously pursued by Tropicana and RKF, and then by Tropicana and Eastern. Nonetheless, RKF seeks production of all documents relating to any development of the Tropicana property. *See e.g., Declaration of RKF's Counsel, Ross Bagley* (ECF No. 103), *Exhibit E,* Request No. 2. These requests are overbroad on their face. A project to build or expand

the Tropicana's exhibit or convention space or to build a single tenant restaurant, does not appear sufficiently similar to the shopping center project to justify production of all documents relating to such developments. RKF is entitled to conduct limited discovery to obtain documents or information, beyond that contained in *Exhibit D* to its Motion, which describe the nature of Penn Gaming's current development plans for the subject property and when Penn Gaming began pursuing the current development project. Such discovery may include conducting a Rule 30(b)(6) deposition of Penn Gaming on these limited topics. If upon completion of this limited discovery, RKF can demonstrate that there is substantial similarity between Penn Gaming's current development plans and the previous shopping center project, then the Court will consider RKF's requests for production of additional documents. If Penn Gaming's current development plans are, in fact, substantially different from the prior retail shopping center project, then further discovery on this matter will not be authorized.

Counsel for the parties shall meet and confer regarding the documents or information to be produced by Defendant Tropicana and/or non-party Penn National Gaming in compliance with the Court's order and to schedule a Rule 30(b)(6) deposition if requested by RKF. If they are unable to agree on the documents or information to be produced in compliance with this order, they should so advise the Court in writing and it will schedule a hearing to resolve the dispute(s). Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff RKF's Motion to Compel (ECF No. 101) and Defendant Tropicana's Countermotion for Protective Order (ECF No. 114) are **granted**, in part, and **denied**, in part, in accordance with the foregoing provisions of this order.

**IT IS FURTHER ORDERED** that discovery is reopened through **September 6, 2017** to complete the limited discovery authorized by this order.

DATED this 6th day of July, 2017.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge